## OGDEN v. RUHM.

(Circuit Court of Appeals, Second Circuit.
May 11, 1925.)

### No. 329.

**1. Contracts ⬡4—Express contract excludes implied assumpsit.**

An express contract to give a certain thing for service excludes the idea of an implied assumpsit for the service.

**2. Assumpsit, action of ⬡1—Action does not lie where agreement is to do something other than pay money.**

Indebitatus assumpsit will not lie, where agreement is to do something other than to pay money, as to give an agency; but, the agency not being given, the promise must proceed for breach of the contract by declaring specially on it.

In Error to the District Court of the United States for the Southern District of New York.

Action by Herschel C. Ogden against Herman D. Ruhm for breach of contract. Judgment for plaintiff, and defendant brings error. Reversed.

Edward Maxson, of New York City (Merritt Lane, of Newark, N. J., of counsel), for plaintiff in error.

Neil P. Cullom, of New York City (Neil P. Cullom and James E. Freehill, both of New York City, of counsel), for defendant in error.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. This writ of error seeks to review a judgment obtained by the defendant in error against the plaintiff in error on a quantum meruit claim. The complaint set forth two causes of action; the first, that the plaintiff in error's assignor had been awarded a contract on its high bid of $300,000 in the sale of a plant owned by the United States government, and that the plaintiff had a one-fourth interest in that bid for his own use under a verbal agreement, which was also supported by correspondence. The second cause of action is a claim for services and disbursements in connection with securing said assignment, and for other services in preparing bids which was made in behalf of the plaintiff in error for the purchase of the same plant. The defendant in error claims to have rendered services and expended moneys for the benefit of the plaintiff in error. It is to be noted that the first cause of action is based upon an express contract, and the second cause of action upon the theory that there is an implied promise to pay for the services rendered by the defendant in error. Both involve the same services. They are inconsistent. If the defendant in error performed some services upon the express understanding that he was to obtain as compensation a one-fourth interest in the bid, it would be inconsistent to allow him a recovery upon the theory that his services were rendered upon an implied promise to pay therefor.

In the early part of 1920, the plaintiff in error's son-in-law, who had a business association of employment with the defendant in error, stated that he could interest the plaintiff in error in financing a chlorine plant. The defendant in error suggested that the parties might become interested in the Belle plant at Charlestown, W. Va., which was to be sold by the government at public bidding. There was some correspondence, and a meeting followed between the parties to this litigation. On May 5, 1920, the defendant in error wrote the plaintiff in error, asking that he might be given an opportunity to take over the selling end of their proposed enterprise. The letter indicates plainly that the defendant in error was working in his own interest at this time, as was the plaintiff in error; the former's interest being the hope of obtaining a selling contract to sell the output of the plant, if purchased by the plaintiff in error. At the outset, it appears that the relationship between the parties was not that of employer and employee. On May 12, 1920, the parties met and discussed the proposition.

Defendant in error testified: "I asked Mr. Ogden if the arrangement I had suggested was satisfactory, and he said practically so —either that or some participation in stock." Later on, in May, 1920, the parties prepared three bids, and the defendant in error stated that he had information that the highest bid at the government sale scheduled in June, 1920, would be $125,000, and he thought they ought not to go higher than $151,000. Thereupon three bids were arranged, all for the benefit of the syndicate; one for $151,900, the second for $204,000, and the third for $250,000, to quote the defendant in error, "with the idea that, if there were no bid intervening between the low one and the next low one, the two highest ones would be withdrawn. If there were intervening bids, the others would be allowed to stand."

He testified he prepared all three bids. The plan was discussed, and it was worded "so as to make two upper ones indefinite

and Stubblefield's definite." (This was the last of the three bids.) Part of the compensation claimed below, and for which an award was granted, was for preparing these bids in the manner described. He says that he attended at Washington with the understanding that, if there was no higher bid than $151,900, he was to object to the two higher bids of his associates, for the reason that they were indefinite. The bidding took place on June 1st. The three bids thus prepared were put in, and there was no bid above the $151,900, except the two; the next bid being $107,000. The defendant in error protested against the highest bids as arranged. The government was not satisfied with any of the bids, and gave notice it would offer the property again for sale on June 19, 1920. On the morning of June 19, 1920, one Ludlow put in a bid of $300,000, and this was accepted. Oberman, who put in the third bid, in which the parties hereto were interested, was employed by the firm of Mitchell & Stevenson, and they, by court proceedings, attempted to make the government accept this high bid in place of the Ludlow bid. There was considerable evidence indicating that the defendant in error gave Ludlow information which the plaintiff in error claimed was contrary to his interests, and therefore that he had breached his obligation of fidelity toward the plaintiff in error.

The defendant in error, in his testimony at the trial and in letters, fairly stated his position to be that he was entitled to one-fourth interest in the bid by express agreement between the parties. It appears that the defendant in error and Ludlow executed a paper on June 22, 1920, wherein an assignment was made of a one-half interest in the Ludlow bid to the defendant in error. The recital of that agreement reads: "Whereas, the party of the first part [the Aeronautical Equipment Company, defendant in error's assignee] is indebted to the party of the second part [Ruhm] for bringing this opportunity to its notice: Now, therefore," etc.

Thereafter the defendant in error suggested to the plaintiff in error that he purchase Ludlow's bid. He asked for $3,000, the amount of money necessary to purchase a one-half interest. The other half interest was then owned by the defendant in error. He telegraphed that he was "holding same [the one-half interest] in trust for account you [defendant Ogden] may direct." The plaintiff in error accepted the offer of Ludlow and made the purchase. On June 23, 1920, defendant in error wrote the plaintiff

in error, stating what his interest in the transaction was, and this was replied to on June 23, 1920. Later a conference was held between the parties and Ludlow in New York City, where other offers for the purchase of the bid were made to the plaintiff in error and were rejected, with the approval or consent of the defendant in error. Thereupon on June 29, 1920, the defendant in error wrote the plaintiff in error:

"I further confirm my statement that, in my opinion, if we derive a profit from the mere sale of the bid in question, that out of the proceeds received from our half all expenses of all parties in regard to the matter should be paid, and of the amount remaining one-half should go to me and one-half to you, for such distribution as you may think proper. In case we proceed with the matter without being able to make a direct sale of the bid, then, of course, I would not be entitled to one-half interest, but would be open to any satisfactory arrangement that may be suggested by you as to my ultimate participation in the operating end. I would like to have in any company finally organized at least one-fourth of the common stock."

An assignment of all the Ludlow interest was later made to the defendant in error and $5,000 was paid therefor; also an assignment of the defendant in error's share was made to the plaintiff in error. On August 21, 1920, the defendant in error wrote: "I am relying on the situation as set out in my letter to you of June 29th, afterwards confirmed by you verbally as properly setting out the situation, and am holding myself in readiness to complete the matter as therein tentatively arranged." On September 3, 1920, he wrote, stating that, after plaintiff in error had obtained the remaining one-half interest in the Ludlow bid, he (the defendant in error) had done nothing. In a letter on September 16, 1920, he again set forth what he conceived to be his rights against the plaintiff in error, and there again referred to his letter of June 29th, and further: "If Mr. Mitchell is so thoroughly convinced of his erroneous idea [that is, that Ruhm had something to do with bringing Ludlow into the situation] that he has his mind made up in advance he cannot be wrong, then I would not care to have any connection of any kind with the matter, and the best thing to do is to have an immediate settlement on my interest in the bid, which, as it stands, is one-fourth of the net value of the same."

The correspondence indicates that there

was no agreement between the parties that the services of the defendant in error should be compensated for, and throughout the entire negotiations, and, indeed, in the testimony of the defendant in error, it is plain that it was the intention of the parties that the defendant in error would have an interest by way of stock ownership or otherwise to the extent of at least one-fourth of the profits made upon selling the bid, and, if a company was organized, he was to have a similar interest in such company. This was consistent with the original negotiations of the parties, namely, that, if the plaintiff in error became interested in operating such a plant as was purchased, the defendant in error was at least to have a contract for selling its output.

The bid was never sold, but a corporation known as the Belle Alkali Company was organized, in which corporation the plaintiff in error held stock and became its president, and the plant was turned over to it when the sale was consummated. The court declined to permit answers to questions which indicated that no profit was made in the operation of the plant.

[1] Where, as here, an express agreement is claimed, it excludes the idea of an implied assumpsit for the services. The defendant in error in his testimony stated:

"Q. And your complaint is that you did not get the operating contract, the selling contract? A. Well, what do you mean by my complaint? Do you mean in this case?

"Q. No; I am not talking about any technical pleadings. A. What I feel, sir, about is that—

"Q. The operating contract? A. That I did not get the operating contract.

"Q. To which you thought you were entitled by virtue of— A. And the reason I went into that contract.

"Q. By virtue of the letters of June 23d and September 9th, and the acceptance of that letter in July, that is what you thought and considered the contract to be, was it not? A. Yes, sir.

"Q. And they had deprived you of that contract, the operating contract; that is right, is it not? A. Yes, sir."

[2] Indebitatus assumpsit will not lie where the agreement is, not for the payment of money, but the doing of some other thing, and the damages are what the plaintiff has lost by reason of being deprived of the thing to which he was entitled under the contract. So the damages here would seem to be his loss in failing to secure the contract for the

sale of the output. There was no sale of the bid, and therefore he did not lose a one-fourth value of the profit on the sale of that bid. It is a well-settled rule that, when an expressed simple contract is open and unexecuted, and the plaintiff proceeds for a breach of it, he must declare specially upon it. The law will not imply a contract where an express one exists. The cause of action upon an express contract cannot be so divided that recovery can be partly upon a general account and partly upon a special. Ladue v. Seymour, 24 Wend. (N. Y.) 60; Osterling v. Cape May Hotel Co., 82 N. J. Law, 650, 83 A. 887; Weiss v. Mauch Chunk Iron Co., 58 Pa. 295; 5 Corpus Juris, p. 1386, § 16. It was pointed out in Ladue v. Seymour, supra, that, the moment it appears that the work was done under a special contract, the implication of a promise to pay is at an end; and this for the reason that the parties have come to an express agreement as to their obligations. The defendant in error's position in this transaction is plain. The evidence is persuasive that he was a promoter, and was dealing for himself as such. He entered into a plan with the plaintiff in error that, when the plan became effective, he might enter into some arrangement by which he might make profit either as first suggested by an interest in the selling contract of the output, or, secondly, an interest of one-fourth on selling the bid. Having thus agreed expressly, it was too late for him to change his position at the trial, and say that he was serving only the plaintiff in error in his endeavor to obtain compensation. It was error to refuse plaintiff in error's application to dismiss the second cause of action at the conclusion of the case, and the exception taken thereto presents reversible error.

There were other errors committed throughout the trial, which are presented in the assignment of errors, but which we need not consider, in view of our conclusion that the verdict should have been directed against the defendant in error upon the cause of action which is the basis of this recovery.

Judgment reversed.

HAND, Circuit Judge (concurring). I do not agree that there was any contract between the parties, except that, if the bid was sold, the plaintiff should have an interest in it. The bid was not sold, and it has now been decided that the plaintiff had no interest in it at all. If he had had a contract that the new company should employ him as

salesman, he would only be entitled to sue for its breach, as Judge MANTON shows. It is quite clear that on June 29, 1920, he did not suppose that he had such a contract, and the matter seems to me very vague. Whether or not he had any quasi contractual right against the defendant at all, at least it could not arise until it appeared that the selling contract, for which alone he originally stipulated, had been denied him. I cannot find any evidence that it ever was. His letter of September 16, 1920, says that he would not go into the company, if Mitchell's suspicion of him remained. This he reaffirmed on his cross-examination. It does not appear that it ever was removed; perhaps he refused to go in. The defendant's letter of October 13, 1920, by no means denied the possibility of any connection between him and the company. Until it appears that he was so refused, there has clearly been no unjust enrichment, and so no claim in quasi contract. If he can prove that he was so refused, perhaps he may be able to recover. It seems to me best to say nothing on that score until the second cause of action has been tried again.